*This opinion is subject to revision before final publication in the Pacific Reporter*

**2019 UT 25**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

ZANE CHARLES SANDERS,
*Appellant.*

No. 20160300
Filed June 24, 2019

On Certification from the Court of Appeals

Third District, West Jordan
The Honorable Judge William K. Kendall
No. 151400229

Attorneys:

Sean D. Reyes, Att'y Gen., Karen A. Klucznik, Asst. Solic. Gen.,
Salt Lake City, for appellee

Andrea J. Garland, Salt Lake City, for appellant

JUSTICE PEARCE authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PETERSEN joined.

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶ 1 Zane Charles Sanders cannot legally possess a firearm because the Utah Code prohibits any individual convicted of a felony from, among other things, "intentionally or knowingly" having a firearm in his possession. UTAH CODE § 76-10-503(1)(b), (3) (2014). A jury convicted Sanders of violating section 503 after police officers responding to a domestic complaint found Sanders in his backyard carrying a rifle.

¶ 2 Sanders claimed that when the police officers arrived at his home, he was moving his girlfriend's son's firearm back into the house. Sanders argued that he was only transporting the rifle because it had been left in the backyard, which abutted an elementary school. He asked the district court to instruct the jury that it could acquit him if it found that he was innocently possessing the weapon. The district court refused. Sanders appeals, arguing that refusal was error. We disagree with Sanders and affirm.

## BACKGROUND

¶ 3 At the time of his arrest, Sanders lived with his Girlfriend.[1] Girlfriend's teenage son, M.M., owned three firearms that he used for hunting. The firearms were stored, unsecured, in the bedroom closet Sanders and Girlfriend shared. Ammunition for those firearms was supposed to be stored separately in M.M.'s bedroom.

¶ 4  One evening, Sanders learned that M.M. had left his hunting rifle outside, unattended, in the backyard. Upset, Sanders argued with Girlfriend about M.M.'s dereliction at a volume that prompted a concerned neighbor to call the police.

¶ 5 The police responded to the complaint. When they arrived, an officer heard a man yell Girlfriend's name. The officer then saw Sanders standing on the back porch holding a rifle. The officer pulled out his flashlight and demanded to see Sanders's hands. Sanders set the rifle down, raised his hands, and said, "I'm not armed."

¶ 6 Sanders refused to talk to the officer and informed him in salty, if somewhat unoriginal, language that he needed a warrant to enter the house. Sanders then went inside, leaving the rifle on the back porch. Sanders had spoken with slurred speech, and the officers believed he was intoxicated. The officers then spoke with Girlfriend. Based on her comments, the officers concluded that Girlfriend's young daughter might be inside. The officers conducted a safety sweep of the home to ensure that the child was safe. During the sweep, the officers observed ammunition in a bedroom and a magazine for a rifle in the living room.

---

[1] "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 8 n.3, 372 P.3d 629 (citation omitted) (internal quotation marks omitted).

¶ 7  After the safety sweep, the officers ran a records check and discovered that Sanders was a restricted person; that is, because Sanders had been convicted of a felony, Utah law restricts him from possessing a firearm. The officers went to the back porch and collected the rifle—which, as it turned out, was fully loaded. The officers then left the home. A few days later, Sanders called the police department and asked if he could get the rifle back.

¶ 8  Two weeks after the initial encounter, the officers returned with a warrant to retrieve firearms, dangerous weapons, ammunition, and any items related to firearms from Sanders's home. Sanders again asked the officers to return the rifle. And Girlfriend told the officers that additional firearms belonging to M.M. were in her bedroom closet. The officers arrested Sanders.

¶ 9  During their search of the home, the officers confiscated two unsecured firearms, multiple magazines, ammunition, a machete, and a sword. Additionally, the officers found a small amount of marijuana.

¶ 10  The State charged Sanders with three counts of possession of a firearm by a restricted person, third degree felonies in violation of Utah Code section 76-10-503(3).[2]

¶ 11  Before trial, Sanders requested an innocent possession jury instruction. Sanders's requested instruction would have told the jury that a restricted person is not guilty of the offense of possession of a firearm "if (1) the firearm was [ob]tained innocently and held with no illicit or illegal purpose, and (2) the possession of the firearm was transitory; that is, that the defendant took adequate measures to rid himself of possession of the firearm as promptly as reasonably possible."

¶ 12  The State opposed the jury instruction. The State argued that the felon-in-possession statute does not leave room for an innocent possession defense. The State further argued that even if

---

[2] The State also charged Sanders with two counts of possession of a dangerous weapon by a restricted person, class A misdemeanors, UTAH CODE § 76-10-503(3)(b), and one count of possession of drug paraphernalia, a class B misdemeanor, UTAH CODE § 58-37a-5(1). The court granted Sanders's motion for a directed verdict as to the drug paraphernalia charge, and the jury found Sanders not guilty of the dangerous weapon charges.

there were such a defense, the facts did not support its application in this case because Sanders's possession was not "transitory."

¶ 13   The district court denied Sanders's request. The court ruled that it did not "need to decide whether or not the innocent possession defense is available here" because, based on the evidence presented at trial, there was no "factual basis to give [the] instruction." The court reasoned that jurisdictions that recognize the defense require the "defendant to demonstrate both that he intended to turn the weapon over to the police and that he was pursuing such an intent with immediacy and through a reasonable course of conduct," which Sanders did not do.

¶ 14   The jury convicted Sanders on one count of possession of a firearm by a restricted person. The jury acquitted him of the two additional charges of possession of a firearm by a restricted person, which were based on a theory that Sanders constructively possessed the firearms that the police officers found in his home. Sanders appealed the conviction. The court of appeals certified the case to this court.

**STANDARD OF REVIEW**

¶ 15   "Whether a jury instruction correctly states the law presents a question of law which we review for correctness." *State v. Houskeeper*, 2002 UT 118, ¶ 11, 62 P.3d 444.

**ANALYSIS**

¶ 16   Sanders asserts that the district court's refusal to instruct the jury on an innocent possession defense constitutes reversible error. Sanders contends that: (1) the defense is consistent with the felon-in-possession statute; (2) the defense is consistent with our precedent; and (3) without the defense, Utah law will criminalize innocent behavior in a fashion that will generate absurd results. The State argues that neither the statute nor case law supports an innocent possession defense and that the Legislature could have rationally intended to criminalize Sanders's conduct.

I. The Statute Does Not Support an
Innocent Possession Defense

¶ 17   To decide whether the felon-in-possession statute includes an innocent possession defense, we begin our inquiry with the statute itself. The point of statutory interpretation is to understand what the Legislature intended. *Bagley v. Bagley*, 2016 UT 48, ¶ 10, 387 P.3d 1000. Because "'[t]he best evidence of the legislature's intent is the plain language of the statute itself,' we look first to the plain

language of the statute." *Id.* (alteration in original) (citation omitted). As we examine the text, "'[w]e presume that the legislature used each word advisedly.'" *Ivory Homes, Ltd. v. Utah State Tax Comm'n*, 2011 UT 54, ¶ 21, 266 P.3d 751 (citation omitted).

¶ 18 Of course, "we do not view individual words and subsections in isolation; instead, our statutory interpretation 'requires that each part or section be construed in connection with every other part or section so as to produce a harmonious whole.'" *Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, ¶ 15, 301 P.3d 984 (emphasis omitted) (citation omitted). "Thus, we 'interpret [] statutes to give meaning to all parts, and avoid[] rendering portions of the statute superfluous.'" *Id.* (alterations in original) (citation omitted).

¶ 19 When a party asks us to recognize a defense to a crime, we must remember that "it is for the legislature to define affirmative defenses to crimes under the Utah Code." *State v. Drej*, 2010 UT 35, ¶ 18, 233 P.3d 476. The Utah Criminal Code governs "the construction of, the punishment for, and *defenses against* any offense" the Code defines. UTAH CODE § 76-1-103(1) (2014) (Emphasis added).[3] Accordingly, "courts of this state 'are bound by the legislature's decision to categorize' and define affirmative defenses." *Drej*, 2010 UT 35, ¶ 18 (citation omitted). And the Code provides "a number of general defenses as well as numerous specific defenses." *State v. Gardiner*, 814 P.2d 568, 574 (Utah 1991).[4]

---

[3] We cite to the version of the statute in effect at the time of Sanders's violation of Utah Code section 76-10-503(3) in December 2014.

[4] General defenses are those that "theoretically apply to all offenses." 1 PAUL H. ROBINSON, CRIM. L. DEF. § 21 (2018). For example, compulsion is a general defense that the Legislature has made available to the prosecution of any crime. UTAH CODE § 76-2-302(1) ("A person is not guilty of an offense when he engaged in the proscribed conduct because he was coerced to do so by the use or threatened imminent use of unlawful physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would not have resisted.").

In contrast, a specific defense "must be grounded in the specific code sections" at issue. *Gardiner*, 814 P.2d at 574. By way of example, section 76-5-203 provides the following affirmative defense to murder: "[T]he defendant caused the death of another . . . under a

(continued . . .)

¶ 20 The Utah Criminal Code does not contain an express innocent possession defense—either as a general defense,[5] or within the specific provision under which Sanders was convicted. A jury convicted Sanders of violating section 76-10-503(3), which provides:

> (3) A Category II restricted person[6] who intentionally or knowingly purchases, transfers, possesses, uses, or has under the person's custody or control:
> > (a) any firearm is guilty of a third degree felony; or
> > (b) any dangerous weapon other than a firearm is guilty of a class A misdemeanor.

¶ 21  Section 503(7) then sets forth the specific defense applicable to that provision, under which a person may transfer a firearm within ten days of becoming a restricted person, but may not "use," "purchase," or "possess[] on the person" the firearm during that period:

> (7)(a) It is an affirmative defense to transferring a firearm or other dangerous weapon by a person restricted under Subsection (2) or (3) that the firearm or dangerous weapon:
> > (i) was possessed by the person or was under the person's custody or control before the person became a restricted person;
> > (ii) was not used in or possessed during the commission of a crime . . .
> > (iii) is not being held as evidence by a court or law enforcement agency;
> > (iv) was transferred to a person not legally prohibited from possessing the weapon; and
> > (v) unless a different time is ordered by the court, was transferred within 10 days of the person becoming a restricted person.

---

reasonable belief that the circumstances provided a legal justification or excuse for the conduct . . . ." UTAH CODE § 76-5-203(4)(a).

[5] *See* UTAH CODE §§ 76-2-301 to -308; *id.* §§ 76-2-401 to -407.

[6] Under section 76-10-503(1)(b), any person who has been convicted of any felony, or meets another specified criteria, is a Category II restricted person.

(b) Subsection (7)(a) is not a defense to the use, purchase, or possession on the person of a firearm or other dangerous weapon by a restricted person.

UTAH CODE § 76-10-503(7).[7]

¶ 22   Thus, section 503 evinces the legislature's thinking on the limited circumstance in which an individual may lawfully possess a firearm after becoming a restricted person. Tellingly, the legislature did not create a law that allows, as Sanders's instruction proposed, that a restricted person may possess a firearm "if (1) the firearm was [ob]tained innocently and held with no illicit or illegal purpose, and (2) the possession of the firearm was transitory; that is, that the defendant took adequate measures to rid himself of possession of the firearm as promptly as reasonably possible."

¶ 23   Acknowledging that section 76-10-503 does not explicitly contain his asserted innocent possession defense, Sanders nevertheless claims that it exists implicitly in that statute. Sanders argues that we should read the statutory term "possess" to exclude innocent possession, as he defines that phrase. In Sanders's view, the statute does not "clarify whether the term 'possess' . . . includes . . . temporary possession for the purpose of returning a [firearm] to its lawful owner." We disagree.

¶ 24   The Utah Criminal Code provides a general definition of "possess," which "means to have physical possession of or to exercise dominion or control over tangible property." UTAH CODE § 76-1-601(10). Section 503 prohibits "possession" of a firearm by a restricted person, and section 76-10-503(7) contains the legislature's decision about the specific circumstance in which a restricted person may engage in behavior that would otherwise violate the statute. The Legislature appears to have concluded that a restricted person may, under certain conditions, transfer a firearm—but only within ten days of becoming a restricted person. *See* UTAH CODE § 76-10-503(7)(a). And that exception does not apply to "use," "purchase," or "possession on the person" of the firearm. *Id.* § 76-10-503(7)(b).[8]

---

[7] Elsewhere in the Code, the Legislature also carved out an exception permitting a restricted person to "own" or "possess" "archery equipment, including crossbows, for the purpose of lawful hunting and lawful target shooting." UTAH CODE § 76-10-512(2).

[8] The Legislature enacted this specific defense against the backdrop of the Code's general defenses, which exonerate a broader

(continued . . .)

¶ 25 As noted above we do not view individual words, such as "possess," in isolation, but in the context of the section, chapter, and code in which they are included. We also presume that the language chosen by the Legislature is meaningful, and that "the expression of one [term] should be interpreted as the exclusion of another." *State v. Stewart*, 2018 UT 24, ¶ 13, 438 P.3d 515 (alteration in original) (citation omitted) (internal quotation marks omitted). Moreover, we "will not infer substantive terms into the text that are not already there. Rather, the interpretation must be based on the language used, and [we have] no power to rewrite the statute to conform to an intention not expressed." *I.M.L. v. State*, 2002 UT 110, ¶ 25, 61 P.3d 1038 (alteration in original) (citation omitted) (internal quotation marks omitted).

¶ 26 Sanders's proposed innocent possession defense would rewrite section 503 to permit a restricted person to "possess[] on the[ir] person" a firearm, more than ten days after becoming a restricted person, for transitory purposes, such as returning the firearm to its lawful owner. For the reasons set forth above, we presume that the Legislature considered when a restricted person might possess a firearm and specified these circumstances in section 76-10-503(7) as well as in the Code's general defenses.

¶ 27 In support of his position, however, Sanders points us to the legislatively defined purposes of the Utah Criminal Code. As Sanders points out, "Utah Code section 76-1-106 directs a court to 'construe[] [criminal statutes] according to the fair import of their terms to promote justice and to effect the objects of the law and general purposes of [s]ection 76-1-104.'" (Quoting UTAH CODE § 76-1-

---

range of otherwise unlawful behavior. *See* UTAH CODE §§ 76-2-301 to -304, -305 to -308; *id.* §§ 76-2-401 to -407. None of the conduct addressed in section 503 is unlawful if, e.g., the restricted person acts under circumstances establishing compulsion, entrapment, or justification. *Id.* §§ 76-2-302, -303, -401.

Sanders does not assert that the jury should have been instructed on the general defense of justification, but he claims that an innocent possession defense would be consistent with it. Even assuming that an innocent possession defense would be "consistent" with the general defense of justification, for the reasons discussed above, the felon-in-possession statute does not leave room for us to use the general defenses to imply a specific defense that the legislature did not see fit to include.

106.) Sanders also directs us to the statement that the Code shall be construed to "safeguard conduct that is without fault from condemnation as criminal." UTAH CODE § 76-1-104(2).

¶ 28 And we sometimes resort to these principles when addressing questions of statutory interpretation regarding the Utah Criminal Code. *See, e.g.*, *State v. Perea*, 2013 UT 68, ¶ 115, 322 P.3d 624 (reasoning that sections 76-1-104 and 76-1-106 "make clear that a sentencing court is to consider all the evidence before it—the totality of the circumstances—in imposing a sentence that is proportionate to the crime and the culpability of the defendant").

¶ 29 But the Code's general statements of purpose do not support Sanders's proposed innocent possession defense. To the contrary, under the Code's guidelines, we are obliged to construe section 503 to "effect the objects of the law and general purposes of [s]ection 76-1-104," UTAH CODE § 76-1-106, which include "forbid[ding] and prevent[ing] the commission of offenses" as the legislature has defined them, *id.* § 76-1-104(1). As Sanders correctly notes, we interpret the Code to safeguard conduct that is without fault. *See id.* § 76-1-104(2). Whether the brief possession of a firearm by a convicted felon is, generally speaking, conduct "without fault" is a legislative judgment, and one the legislature has answered in the negative. As a result, we do not conclude that the felon-in-possession statute implicitly provides an innocent possession defense.

## II. Our Case Law Does Not Require an Innocent Possession Defense

¶ 30 Sanders next argues that two of our cases support the conclusion that the felon-in-possession statute contains an implicit innocent possession defense. Sanders first points to *State v. Davis* to contend that we have already recognized an affirmative defense for a restricted person who was "innocent[ly] handling" a weapon. 711 P.2d 232, 233 (Utah 1985) (per curiam). The State asserts that *Davis* does not "support the broad innocent possession defense" Sanders proposes and, even if it did, "this Court should overrule" *Davis* in that respect. We agree with the State.

¶ 31 In *Davis*, the defendant contended that an additional jury instruction should have been given regarding the definition of "possess," as that term is used in section 503. *Davis*, 711 P.2d at 233–34. Davis had been convicted of unlawfully possessing a firearm in violation of that provision, following the district court's instruction to the jury that: "possession, custody or control of a firearm [is] more than the innocent handling of the weapon, but require[s] a willing

and knowing possession with the intent to control its use or management." *Id.* at 233 (internal quotation marks omitted). On appeal, neither Davis nor the State asserted this instruction was erroneous. With respect to whether an additional instruction—addressing the same topic—was required, we concluded it was not. *Id.* at 233–34 ("Defendant's requested additional paragraph to the instruction was an unnecessary embellishment of an otherwise adequate statement. It was not error for the trial court to decline its inclusion in the instructions.").

¶ 32 We reached that conclusion in a quaint two-page per curiam opinion.[9] Along the way, we commented that we "s[aw] no error in the jury instruction . . . explaining the intent and conduct necessary to sustain a finding of possession by defendant." *Id.* at 233. The instruction did "not create confusion or misunderstanding as to the statutory elements or mens rea of the crime." *Id.* (Emphasis omitted). And it allowed Davis to argue his theory that he only "innocent[ly] handl[ed]" the weapon. *Id.*

¶ 33 Sanders reads our opinion as endorsing Davis's argument that he could not be convicted if he innocently handled the firearm. We are not persuaded, however, that it is the correct reading of *Davis* nor that *Davis* dictates our resolution of this matter.

¶ 34 As an initial matter, it appears the question of an innocent possession affirmative defense was never squarely presented to us. *Davis* did not hold that Utah law recognized an innocent possession defense. Rather, it reasoned that the jury instruction was not erroneous because it properly "explain[ed] the intent and conduct necessary to sustain a finding of possession." *Id*. *Davis* observed that the instruction did "not create confusion or misunderstanding as to the statutory elements or mens rea of the crime" and noted that it "allowed defendant to argue his theory of the case that his was only an 'innocent handling of the weapon,'" meaning that he did not have an "intent to control its use or management." *Id.* (Emphasis omitted). Therefore, *Davis* does not establish any precedent with respect to an innocent possession affirmative defense.

¶ 35 Even assuming that *Davis* speaks to the issue, the precedential value of such a holding would be minimal and makes this portion of *Davis* susceptible to being overruled under the rubric

---

[9] Brevity may be the soul of wit, but it is anathema to our more recent practice.

that *Eldridge v. Johndrow*, 2015 UT 21, 345 P.3d 553, outlines for revisiting our precedents. And the State has shouldered its burden of demonstrating that the portion of *Davis* that could be read to speak to the innocent possession defense should be overturned.

¶ 36  "Because stare decisis is so important to the predictability and fairness of a common law system, we do not overrule our precedents 'lightly.'" *Eldridge*, 2015 UT 21, ¶ 21 (citation omitted). "However, our presumption against overruling precedent is not equally strong in all cases." *Id.* ¶ 22. This court has "identified two broad factors that distinguish between weighty precedent and less weighty ones." *Id.* Those factors are "(1) the persuasiveness of the authority and reasoning on which the precedent was originally based, and (2) how firmly the precedent has become established in the law since it was handed down." *Id.* The State contends that we should overrule *Davis* under the *Eldridge* factors. We agree. To the extent that *Davis* established precedent for an innocent possession affirmative defense, we overrule it.

¶ 37  "The first factor in determining how much deference a precedent should be afforded is the persuasiveness of the authority and reasoning on which the precedent is based." *Id.* ¶ 24. As the State argues, *Davis*'s analysis does not inspire much respect. In reaching our conclusion, we remarked on the law regarding possession, but we never referenced section 503's text, parsed the Utah Criminal Code's general definition of "possess," *see* UTAH CODE § 76-1-601(10), or analyzed whether the plain language left room for an affirmative defense. We did not even nod at the cases from other jurisdictions that have wrestled with the topic. Simply stated, if *Davis* recognized an innocent possession defense, it appears to have done so accidentally.

¶ 38  Even when we acknowledge that our reasoning is weak, or that we would decide a case differently if we were writing on a tabula rasa, we are still hesitant to overrule precedent if it has become "firmly established in Utah law." *Eldridge*, 2015 UT 21, ¶ 33. That is not the case here. To determine if an opinion has been firmly established as precedent, we consider a wide variety of factors "including the age of the precedent, how well it has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned." *Id.* ¶ 22.

¶ 39  The State argues that even though we decided *Davis* thirty-three years ago, it has never been cited in a written opinion for the proposition that the felon-in-possession statute permits an innocent

possession defense. Rather, *Davis* is typically cited for the proposition that a defendant's intent or state of mind can be proven by inferences based on his conduct and the surrounding circumstances.[10] *See, e.g., State v. Garcia-Mejia*, 2017 UT App 129, ¶ 30, 402 P.3d 82.

¶ 40 Moreover, *Davis* did not rely on any "precursors in Utah law," *see Eldridge*, 2015 UT 21, ¶ 34, with respect to an innocent possession defense, *see Davis*, 711 P.2d at 233–34. As noted above, we made no effort to tie *Davis* to the debate in other jurisdictions about an innocent possession defense. And none of the cases we cite in *Davis* spoke to the creation of an affirmative defense. *Id.* at 233.

¶ 41 Finally, in deciding whether to overturn precedent, we consider whether doing so would "undermine the public's substantial reliance upon an established legal principle." *Eldridge*, 2015 UT 21, ¶ 35 (citation omitted). However, when "a doctrine has not been necessary to the outcome of many cases, it is unlikely that the public has relied on it in any substantial way." *Id.* ¶ 36. Such is the case here.

¶ 42 The *Eldridge* factors thus weigh in favor of overruling that portion of *Davis*. Therefore, to the extent that *Davis* can be read to establish an innocent possession affirmative defense, we overrule it.

¶ 43 Sanders's next argument presents a more compelling, if ultimately unavailing, theory. Sanders contends that because we found that the Controlled Substances Act (Act), UTAH CODE §§ 58-37-1 et seq., contained an implicit innocent possession defense, *State v. Miller*, 2008 UT 61, 193 P.3d 92, we should find one here. And Sanders has something of a point—the cases present similar questions of statutory construction and, without further inquiry, we might expect to reach the same result here as we did in *Miller*.

¶ 44 We nevertheless conclude that *Miller* does not control the outcome in this case. Important textual differences preclude our reaching the same result with respect to both statutes. And we recognize that *Miller* addressed a question relating specifically to the possession of controlled substances, and we see no compelling reason to extend *Miller*'s reasoning to the felon-in-possession statute.

¶ 45 In *Miller*, the defendant was convicted of possessing a controlled substance in violation of the Act. 2008 UT 61, ¶ 1. He

---

[10] A holding that remains untouched by this opinion.

appealed, arguing that the jury should have been instructed on his proposed defense of innocent possession. *Id.* We examined the definition of "possess" that applied to the Act, *see id.* ¶ 19 n.14 (citing UTAH CODE § 58-37-2(1)(ii)), and concluded that its broad terms did not "clarify whether the term 'possess[]' . . . includes . . . temporary possession for the purpose of returning a controlled substance to its lawful owner," *id.* ¶ 19. In other words, we found no language in the Act directly addressing the question of temporary or transitory possession.

¶ 46 Seeking further guidance, we noted our responsibility under the Utah Criminal Code to construe provisions "according to the fair import of their terms to promote justice" and to "safeguard conduct that is without fault from condemnation." *Id.* ¶ 20 (emphases omitted) (quoting UTAH CODE §§ 76-1-104, -106). We then recited a number of scenarios in which we could see the Act sweeping in "conduct that is without fault." *Id.* ¶¶ 20–21. For example, we hypothesized about a "daughter who no longer lives at home but who picks up her sick mother's prescription medication and drives it to her mother's home," and a "house guest who inadvertently leaves a prescription bottle of pills" in a friend's house, creating a situation in which the friend "could do nothing short of immediately fleeing her home to avoid 'possessing' the pills." *Id.* ¶ 21. In light of "a myriad of absurd prosecutorial possibilities," we concluded that the Act implicitly included an innocent possession defense. *Id.*

¶ 47 As noted above, the similarities between the Act and the felon-in-possession statute could tempt us to simply apply *Miller*'s reasoning here. But our task is not that simple—we must interpret section 503 as the legislature intended. To do so, we construe the statute according to its plain language, giving meaning to its terms and reading those terms in context. Ultimately, the differences in the statutes prove more powerful than their commonalities.

¶ 48 In *Miller*, we lacked any indication that the legislature had considered temporary or transitory possession of a controlled substance for purposes of, e.g., delivering the substance to its lawful owner. Accordingly, we examined the possible consequences of such a rule and concluded that the legislature would not have intended to criminalize that conduct. *Id.* ¶ 21. Thus, for purposes of the Act, we construed the definition of "possess[]" in section 58-37-2(1)(ii) as "exclud[ing] temporary possession of a controlled substance for the purpose of returning it to its lawful owner." *Id.* ¶¶ 19 & n. 14, 24.

¶ 49 Here, we address a similar question but in the context of a different statutory scheme. And with respect to legislative intent, we have guidance that we lacked in *Miller*. The legislature's textually expressed judgment that temporary or transitory possession of a firearm by a restricted person is not generally a lawful activity must govern our interpretation. *See* UTAH CODE § 76-10-503(7). Accordingly, we are not at liberty to alter that background rule and imply a defense under which temporary or transitory possession is, generally, lawful. While the legislature could have excused temporary possession of firearms by restricted persons, in the way we concluded it had when dealing with the temporary possession of controlled substances by members of the general public, the legislature did not.

¶ 50 Relying in part on *Miller*, Sanders points to two related canons of construction and argues that their application supports his reading of section 503. Both deal with absurd results. Under the first, "when the statutory language plausibly presents the court with two alternative readings, [this court] prefer[s] the reading that avoids absurd results." *State ex rel. Z.C.*, 2007 UT 54, ¶ 15 n.5, 165 P.3d 1206. Under the second, "a court should not follow the literal language of a statute if its plain meaning works an absurd result." *Id.* ¶ 11 (citation omitted) (internal quotation marks omitted). The second canon demands a stronger showing of absurdity, given "the level of caution required when this court interprets a statute contrary to its plain meaning." *See id.* ¶ 15 n.5. Sanders's briefing does not delineate between the two, and we interpret it as raising both points.

¶ 51 Sanders argues that the criminalization of transitory possession, as outlined in his proposed instruction, would be "absurd," and he cites the example of his own conviction as "demonstrat[ing] the injustice that may result from strictly construing the term 'possess.'" Sanders characterizes his own conduct as "innocently handl[ing] the weapon temporarily" "to place the rifle out of the reach of passersby, particularly children in the adjacent schoolyard," "until he could return the firearm to M.M." His argument fails, however, because he has not demonstrated that a legislative policy barring convicted felons from temporarily possessing firearms would be absurd. Or that the application of that policy to him, under the circumstances presented here, yielded an absurd result. As the State asserts, the legislature could reasonably have intended to criminalize Sanders's conduct, as well as temporary or transitory possession of a firearm by a convicted felon generally.

¶ 52   We have recognized the dangers the legislature sought to criminalize in the felon-in-possession statute.[11] In *State v. Willis*, we reasoned that the legislature was able to "regulat[e] the potentially deadly privilege of firearm possession by convicted felons." 2004 UT 93, ¶ 6, 100 P.3d 1218. In *State v. Nielsen*, we said that the purpose of section 76-10-503 "was to deter those convicted of violent crimes from thereafter having guns, loaded or unloaded." 544 P.2d 489, 490 (Utah 1975). While the legislature has since broadened the statute to deter all felons—not just those convicted of violent crimes—this policy choice remains the same.

¶ 53   With respect to brief possession of a firearm, the legislature could rationally have concluded that permitting an exception for temporary or transitory possession would run afoul of section 503's legislative purpose. And, therefore, prohibited restricted persons from possessing firearms, even briefly. Drawing the line in that manner, the legislature provides a bright demarcation between legal and illegal conduct. This bright line is particularly helpful here, since, as the State argues, "Utah's statutory scheme reflects the legislature's recognition that 'danger may arise quickly.'" (Quoting *United States v. Johnson*, 459 F.3d 990, 998 (9th Cir. 2006).) This bright line also prevents trials from focusing on the felon's rationale for

---

[11] Other jurisdictions have recognized these risks as well. The Ninth Circuit Court of Appeals has opined that the federal felon-in-possession statute reflects a congressional awareness that "danger may arise quickly" once a gun is in a felon's hands. *United States v. Johnson*, 459 F.3d 990, 998 (9th Cir. 2006). An individual "need only pull the trigger, an act which can be completed in a split second and which is controlled and influenced by nothing more than the defendant's whim." *United States v. Matthews*, 520 F.3d 806, 809 (7th Cir. 2008) (citation omitted) (internal quotation marks omitted). "Neither the language of the [federal] felon-in-possession statute, nor its evident purpose, encourage the court to develop defenses that leave much room for benign transitory possession. The statute bans possession outright without regard to how great a danger exists of misuse in the particular case." *United States v. Teemer*, 394 F.3d 59, 64 (1st Cir. 2005). "The very structure of the Gun Control Act demonstrates that Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous. These persons are comprehensively barred by the Act from acquiring firearms by any means." *Barrett v. United State*, 423 U.S. 212, 218 (1976).

possessing a gun he is forbidden from possessing. Accordingly, we cannot say that it was absurd for the legislature to enact a law that required Sanders to find some other way of getting the firearm into the house.

¶ 54   That is not to say that Sanders's argument is completely devoid of merit. It is not difficult to conceive of factual scenarios where the lack of an innocent possession defense might lead to an absurd result. For example, if a felon dispossessed a toddler of a loaded gun, and immediately placed the gun out of harm's way, we might conclude that a conviction for that behavior would be absurd.[12] But that is not the case before us.[13]

---

[12] In this regard, there seems to be an interesting interaction between the absurd results doctrine and the common law defense of necessity. Although Utah criminal law is wholly statutory and there are no longer common law defenses to statutory crimes, *see* UTAH CODE § 76-1-103, at first blush it appears that many of the instances in which we can envision a court concluding that a conviction under the felon-in-possession statute would be absurd would be those in which a jury applying the common law defense might have found that the defendant's actions were necessary.

The necessity defense applied where a person was confronted with a "choice of two evils: either he may violate the literal terms of the criminal law and thus produce a harmful result, or he may comply with those terms and thus produce a greater . . . amount of harm." 2 WAYNE R. LAFAVE, SUBST. CRIM. L. § 10.1 (3d ed. 2018). The public policy underlying the necessity defense is that "the law ought to promote the achievement of higher values at the expense of lesser values, and sometimes the greater good for society will be accomplished by violating the literal language of the criminal law." *Id.* § 10.1(a). The necessity defense is narrow, however, and it fails "if there was a reasonable, legal alternative to violating the law." *State v. Tuttle*, 730 P.2d 630, 635 (Utah 1986) (quoting *United States v. Bailey*, 444 U.S. 394, 410 (1980)). The necessity defense therefore requires that the defendant (1) acted with the intent to avoid the greater harm, (2) honestly and reasonably believed that the act was necessary to avoid the greater harm, (3) no alternative course of action existed to avoid the imminent harm, (4) successfully avoided the greater harm, and (5) was not personally at fault in creating the situation that led to the imminent harm. *See* 2 SUBST. CRIM. L. § 10.1(d)(1)–(6).

(continued . . .)

¶ 55 Here, the legislature could have rationally intended to criminalize Sanders's conduct. His retrieval of the rifle from the backyard was not reasonably necessary to avoid an imminent greater harm; the firearm was in a fenced backyard on a Friday night. Thus, we cannot conclude that a reasonable legislature could not have intended for this statute to apply to Sanders, and application of the statute to Sanders does not lead to an absurd result.

## CONCLUSION

¶ 56 We find no innocent possession defense explicitly or implicitly in Utah Code section 76-10-503. Our case law does not require us to recognize an implicit innocent possession defense in this statute. And Sanders's conviction does not yield an absurd result. We affirm the conviction.

--------

Because the question is not presented to us in these terms, and because we conclude that Sanders's conviction is one that a rational legislature could have intended, we offer no opinion on the topic. But it appears that common law necessity could, in an appropriate case, inform an absurd results analysis.

[13] In other words, we can envision hypothetical circumstances involving possession of a firearm that the legislature would not have intended to criminalize, but they fall into a much narrower category than Sanders's proposed instruction. And we anticipate that, when those cases arise, they may be addressed through the absurd results doctrine.