**2021 UT 65**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

DAVID CHRISTIANSEN as personal representative of THE ESTATE OF
KASEY CHRISTIANSEN,
DAVID CHRISTIANSEN, KAITLIN CHRISTIANSEN, and JOCALYN
CHRISTIANSEN as heirs of KASEY CHRISTIANSEN,
*Appellants*,

*v.*

HARRISON WESTERN CONSTRUCTION CORP.,
*Appellee*.

No. 20180569
Heard November 15, 2019
Filed November 4, 2021

On Appeal of Interlocutory Order

Third District, Salt Lake
The Honorable James D. Gardner
No. 170905685

Attorneys:

Judson D. Burton, Murray, for appellants

Brett N. Anderson, Scott R. Taylor, Salt Lake City, for appellee

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE LEE, JUSTICE HIMONAS, JUSTICE PEARCE, and
JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE authored a concurring opinion.

JUSTICE HIMONAS authored a concurring opinion, in which JUSTICE
PEARCE and JUSTICE PETERSEN joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

### Introduction

¶1    Kasey Christiansen was killed at work when the Caterpillar mini-excavator he was operating rolled down the mountainside in Little Cottonwood Canyon. Mr. Christiansen's Estate, father, and daughters ("the Christiansen parties") sued his employer, Harrison Western, for damages. But the district court dismissed their lawsuit based on a provision of the Workers' Compensation Act that bars employees from suing their employers over work-related injuries. The Christiansen parties appeal this dismissal, arguing that a narrow exception to the Act, which allows employees to sue over injuries caused by an employer's intentional act, applies to Mr. Christiansen's fatal injuries because they were the result of Harrison Western's intentional act. Because the Christiansen parties have failed to sufficiently plead that Harrison Western acted intentionally, we affirm the district court's dismissal of their complaint.

### Background[1]

¶2    In 2016, the Utah Department of Transportation ("UDOT") awarded Harrison Western a public contract to install a Blackjack Gazex avalanche control system near Alta Ski Resort in Little Cottonwood Canyon. According to UDOT, the project "require[d] special procedures relating to safety" based on the "steep and mountainous terrain at elevations from 9300 to 9800" feet. Based on this steep terrain, UDOT believed that a "walking excavator[]," which is a "type of excavator with legs that hold to steep surfaces," was "the proper type of excavator for mountainous terrain."

¶3    Although Harrison Western "knew that a walking excavator was essential for the safe completion" of the project, and it had "extensive experience" in "high angle and alpine environments," including experience using "walking excavators," it rented a Caterpillar mini-excavator, rather than a walking excavator, to complete the UDOT project.

---

[1] In reviewing a district court's grant of a 12(b)(6) motion to dismiss, "we accept the factual allegations in the complaint as true and consider them and all reasonable inferences to be drawn from them in a light most favorable to the plaintiff." *Helf v. Chevron U.S.A., Inc.* (*Helf I*), 2009 UT 11, ¶ 3, 203 P.3d 962 (citation omitted). We recite the facts accordingly.

¶4   Harrison Western's superintendent of the project, Erik Sowell, directed Mr. Christiansen to operate the mini-excavator on the mountainside to "dig a trench line for . . . gas lines" under the Gazex machine. On multiple occasions while performing this work, Mr. Christiansen "slid down the mountain" in the mini-excavator. Harrison Western was aware of these slide-offs, but took no mitigation measures to prevent future slide-offs or rollovers. And after one slide, Mr. Christiansen was "told . . . to take the rest of the day off."

¶5   On October 12, 2016, Mr. Christiansen was operating the mini-excavator "on an approximate 40-degree slope" when it rolled down the mountain. He "was ejected and sustained significant head injuries and evisceration of his abdomen." He died as a result of his injuries.

¶6   The Christiansen parties brought claims against Harrison Western for negligence, known or expected injury, and vicarious liability. Harrison Western moved to dismiss, arguing that the Workers' Compensation Act's exclusive remedy provision—which prevents most tort suits against employers—barred the Christiansen parties' claims.

¶7   In response, the Christiansen parties moved for leave to amend and submitted to the district court a proposed Second Amended Complaint in which they alleged that Harrison Western intentionally injured Mr. Christiansen. In support of this allegation, the Christiansen parties pointed to the following facts: (1) Harrison Western had experience with similar projects on mountainous terrain; (2) it was aware that a walking excavator was necessary based on UDOT's bid summary; and (3) it failed to take additional safety precautions after the excavator slid on prior occasions. The Christiansen parties argued that these facts were sufficient to bring Harrison Western's actions within the Act's intentional-injury exception.

¶8   After considering the motion to dismiss and the Christiansen parties' proposed Second Amended Complaint, the district court dismissed their claims against Harrison Western, concluding that the Christiansen parties had failed to allege that Harrison Western had acted intentionally and that the proposed changes to their complaint did not change this.

¶9　We granted the Christiansen parties' petition for permission to appeal this interlocutory order.[2] We have jurisdiction under Utah Code section 78A-3-102(3)(j).

## Standard of Review

¶10　"A rule 12(b)(6) motion to dismiss admits the facts alleged in the complaint but challenges the plaintiff's right to relief based on those facts."[3] The grant or denial of a rule 12(b)(6) motion is a question of law that we review for correctness, giving no deference to the district court's determination.[4] When a motion to amend a pleading is denied because the amendment would be futile, we review for correctness, giving no deference to the district court's determination.[5]

## Analysis

¶11 In dismissing the Christiansen parties' complaint and denying their request to amend, the district court concluded that their complaint failed to allege any set of facts supporting their claim that Mr. Christiansen's fatal injuries were the result of an intentional act, and that the additional facts in their proposed Second Amended Complaint did not cure this defect. Even when we view the alleged facts in the light most favorable to the Christiansen parties and "indulge all reasonable inferences in [their] favor," we conclude that the facts and inferences are insufficient to support a claim that Harrison Western intended Mr. Christiansen's injury.[6] Accordingly, the Workers' Compensation Act's exclusive remedy provision bars the Christiansen parties' claims. As a result, we affirm the district court's dismissal of their complaint.

¶12 In so doing, we consider the additional facts the Christiansen parties presented in their proposed Second Amended

---

[2] The Christiansens also asserted claims against UDOT and Ahern Rentals, Inc., the company that rented the mini-excavator to Harrison Western for the UDOT project.

[3] *Helf v. Chevron, U.S.A., Inc.* (*Helf I*), 2009 UT 11, ¶ 14, 203 P.3d 962 (citation omitted). *See also* UTAH R. CIV. P. 12(b)(6).

[4] *Id.*

[5] *Haik v. Jones*, 2018 UT 39, ¶ 16, 427 P.3d 1155.

[6] *Arrow Indus., Inc. v. Zions First Nat'l Bank*, 767 P.2d 935, 936 (Utah 1988).

Complaint. Because we agree with the district court that these additional facts do not cure the defect in the Christiansen parties' complaint, we conclude that their proposed amendment was futile. Accordingly, we also affirm the district court's denial of the Christiansen parties' request to amend.

## I. The Christiansen Parties Fail to State a Claim Upon Which Relief Can Be Granted Because We Cannot Reasonably Infer Harrison Western Believed Mr. Christiansen's Fatal Injuries Were Virtually Certain to Occur

¶13 The Christiansen parties argue that the district court erred in applying the Workers' Compensation Act's exclusive remedy provision to dismiss their complaint. Under the Act, employees are barred from suing their employers for injuries stemming from workplace accidents—except where the employer intended the harm. This exception is called the intentional-injury exception. A party's claim can fall within the intentional-injury exception where the party pleads facts leading to a reasonable inference[7] that the employer was "virtually certain" that the employee's injury would occur.[8] The Christiansen parties assert they pled sufficient surrounding circumstances for us to reasonably infer that Harrison Western believed Mr. Christiansen's injuries were virtually certain to occur. We disagree. Because the Christiansen parties only allege facts

---

[7] A 12(b)(6) motion to dismiss challenges the "sufficiency of the pleadings, not the underlying merits" of the claim. *Am. West Bank Members, L.C. v. State*, 2014 UT 49, ¶ 15, 342 P.3d 224 (citation omitted). When we "review[] a dismissal under Rule 12(b)(6) . . . , we accept the plaintiff's description of facts alleged in the complaint to be true, but we need not . . . accept legal conclusions in contradiction of the pleaded facts." *Id.* ¶ 7 (citation omitted). We then look at the applicable law to determine whether the facts alleged support the claims for relief. *See id.* ¶ 15. A dismissal "should be affirmed only if it clearly appears that [the plaintiff] can prove no set of facts in support of his claim." *Id.* ¶ 7 (alteration in original) (citation omitted). If there is "any doubt about whether a [plaintiff's] claim should be dismissed for lack of factual basis, the issue should be resolved in favor of giving the party an opportunity to present its proof." *Zisumbo v. Ogden Reg'l Med. Ctr.*, 2015 UT App 240, ¶ 9, 360 P.3d 758 (citation omitted).

[8] *Helf v. Chevron, U.S.A., Inc.* (*Helf I*), 2009 UT 11, ¶ 43, 203 P.3d 962.

that, at most, would support a conclusion that Harrison Western acted with willful negligence, not intentionally, they fail to allege sufficient facts to bring their claims within the intentional-injury exception of the Act. As a result, we affirm dismissal.

¶14 In determining whether the Christiansen parties' complaint contains sufficient facts to fall within the Act's intentional-injury exception, we must first consider the purpose and language of the Act.[9] This is because the language of the Act, and our case law interpreting that language, sheds light on the narrow nature of the exception's scope.

¶15 The Workers' Compensation Act is a comprehensive administrative scheme that provides the exclusive remedy for accidental workplace injuries.[10] Its "primary objective" is to "remove industrial negligence, in all its forms, from the concept of the law of tort."[11] To accomplish this objective, employers are relieved under the Act's exclusive remedy provision of civil liability for an employee's workplace injuries:

> The right to recover compensation pursuant to this chapter for injuries sustained by an employee, whether resulting in death or not, is the exclusive remedy against the employer . . . and the liabilities of the employer imposed by this chapter is in place of any and all other civil liability whatsoever, at common law or otherwise, to the employee . . . on account of any accident or injury or death, in any way contracted, sustained, aggravated, or incurred by the employee in the course of or because of or arising out of the employee's employment, and an action at law may not be maintained against an employer . . . based upon any accident, injury, or death of an employee.[12]

In exchange for their ability to sue employers for civil damages, injured employees receive a "simple, adequate, and speedy" remedy

---

[9] *Whipple v. American Fork Irrigation Co.*, 910 P.2d 1218, 1220 (Utah 1996) (explaining that in reviewing a dismissal under rule 12(b)(6) we must "first examine the applicable law").

[10] *Helf I*, 2009 UT 11, ¶¶ 16–17.

[11] *Id.* ¶ 17 (citation omitted).

[12] UTAH CODE § 34A-2-105(1).

without the burden of showing the employer's fault.[13] In other words, in exchange for receiving a no-fault recovery under the workers' compensation system, employees may not sue their employers for on-the-job injuries.

¶16 But the Act does not protect employers from liability for injuries resulting from the employer's intentional act.[14] In *Bryan v. Utah International*, we held that the Act did not prohibit the employee's claim for damages, because a supervisor "intentionally caused a large cable to hit [an] employee."[15] In so doing, we reasoned that the exclusive remedy provision does "not insulate an employer from liability"[16] for a "wrongful act" that is "not only done knowingly, but with the knowledge that it was wrongful to do it."[17] We have subsequently referred to this exception as the intentional-injury exception.[18]

¶17 But it is not always clear that an employer acted intentionally to injure an employee. In *Helf v. Chevron U.S.A., Inc.*, we recognized that, unlike the alleged battery in *Bryan*, some "injury-producing activities" are not "clearly intentional."[19] Because an employer's intent is not always clear, we explained that an employee's injury can fall within the intentional-injury exception when the employee can show that the employer "knew or expected that injury would occur as a consequence of his [or her] actions . . . ."[20]

¶18 So, after our decision in *Helf*, an employee can successfully invoke the intentional-injury exception at the pleading stage in one of two ways. First, the employee can allege "that the actor desired the consequences of his [or her] actions."[21] Second, the employee can allege, by pleading facts suggesting that the employer believed the

---

[13] *Helf I*, 2009 UT 11, ¶ 16 (citation omitted).

[14] *Bryan v. Utah Int'l*, 533 P.2d 892, 894 (Utah 1975).

[15] *Helf I*, 2009 UT 11, ¶ 18 (citing *Bryan*, 533 P.2d at 892).

[16] *Id.* ¶ 32 (citing *Bryan*, 533 P.2d at 894).

[17] *Bryan*, 533 P.2d at 894.

[18] *Helf I*, 2009 UT 11, ¶ 18.

[19] *Id.* ¶ 31.

[20] *Id.* ¶ 26.

[21] *Id.* ¶ 43.

employee's injury was "virtually certain to result," that the employer "knew or expected that injury would occur as a consequence of his [or her] actions."[22] Because, in the absence of an admission of guilt, an employer's subjective belief "can only be inferred from the surrounding circumstances," an employee must assert sufficient facts to support a reasonable inference that the employer knew the injury was virtually certain to occur.[23]

¶19 In order to assert sufficient "surrounding circumstances" that the employer believed injury was virtually certain to occur, an employee must plead more than an assertion that the employer knew there was some *risk* of injury. In other words, the employee must do more than assert that "some injury was substantially certain to occur at some time."[24] Provisions in the Act make this clear.

¶20 The Act explicitly covers injuries caused by an employer's willful conduct. That is, willful conduct alone is not sufficient to invoke the intentional-injury exception of the Act. For example, in subsection 34A-2-301(2), the Act imposes a fifteen percent penalty on employers who cause an injury through their "willful failure" to comply with "the law," "a rule of the commission," "any lawful order of the commission," or "the employer's own written workplace safety program." And subsection 34A-2-301(1) specifically provides that it is unlawful for employers to "knowingly" permit employees to work in unsafe environments as a result of their failure to "provide and use safety devices and safeguards," "adopt and use methods and processes reasonably adequate to render the employment and place of employment safe," or "to do every other thing reasonably necessary to protect the life, health, and safety of the employer's employees." Because the Act covers an employer's willful conduct—conduct that rises above ordinary negligence, but short of intentional conduct[25]—it is clear that, to escape the scope of

---

[22] *Id.* ¶¶ 26, 43.

[23] *Helf v. Chevron U.S.A., Inc.* (*Helf II*), 2015 UT 81, ¶ 47, 361 P.3d 63; s*ee also Selvage v. J.J. Johnson & Assocs.*, 910 P.2d 1252, 1262 n.9 (Utah Ct. App. 1996) ("[I]ntent can rarely be established directly, and therefore circumstantial evidence must be examined as to the circumstances surrounding the transactions in question.").

[24] *Helf I*, 2009 UT 11, ¶ 43.

[25] *Bryan*, 533 P.2d at 894 (citing *Park Utah Mining Co. v. Indus. Comm'n*, 220 P. 389, 390 (Utah 1923)).

the Act by invoking the intentional-injury exception, an employee must allege facts from which it can reasonably be inferred that the employer's conduct rose beyond gross negligence or willful conduct.

¶21 This means that to satisfy the "virtually certain" standard, an employee must allege "[m]ore than [the employer's] knowledge or appreciation of risk"[26] or that the employer knew "some injury was substantially certain to occur at some time."[27] Instead, the facts must support a reasonable inference that the employer believed injury was virtually certain to occur.[28] Our case law provides examples of how this virtually certain standard can be met.

¶22 We have held that injury is virtually certain to occur when an employer directs an employee to perform a specific task with the knowledge or expectation that "the *assigned task* will injure the *particular employee* that undertakes it."[29] And we have imputed this mental state to an employer who is aware that an assigned task has previously caused injury under the same circumstances and then failed to take any measures to create a different outcome.[30] Our past applications of the "virtually certain" standard suggest that injury is virtually certain when, based on the alleged facts, it would be unreasonable to believe an employer who claims she did not know that the employee's injury would be the consequence of her action.

---

[26] *Helf I*, 2009 UT 11, ¶ 41.

[27] *Id.* ¶ 43.

[28] *Id.*

[29] *Id.* (emphases added). The nature of the assigned task and circumstances surrounding a past injury must be of such a nature that the employer would have expected an injury to the specific employee when she assigned the task on the particular occasion at issue. It is insufficient that there is a mere probability of injury (even a recklessly high one) because of similar injuries in the past. *See id.* ¶ 41 (explaining that our case law "maintains the distinction between intent and probability by focusing on whether the actor knew or expected that injury would occur to a particular employee performing a specific task in determining whether an injury was intentional. It does not focus on whether an injury was substantially certain to occur to an unknown employee at some future time—an inquiry driven by probability, not intent.").

[30] *Id.* ¶¶ 44–46.

¶23 The facts underlying our decision in *Help I* provide an example of surrounding circumstances in which it would be unreasonable to believe an employer who claimed he or she did not know an employee's injury was virtually certain to occur. In that case, Ms. Helf alleged that her employer had instructed another employee to neutralize the toxicity of caustic sludge through a process the employer "knew or should have known" "would create noxious, dangerous, and harmful vapors."[31] When the neutralization process was first initiated, a chemical reaction with the caustic sludge "released a noxious purple cloud" containing a number of "toxic chemical compounds."[32] This cloud drifted across the employer's premises, "setting off alarms and causing several of [the employer's] employees, some of whom were hundreds of yards from the [neutralization site], to fall ill and be sent home."[33]

¶24 In the aftermath of this incident, the employer did not "take any safety measures."[34] Instead, the employer "decided to resume the process later in the evening after a shift change and under cover of night."[35] When Ms. Helf reported to work later that night, her night-shift supervisor directed her to re-initiate the neutralization process.[36] When Ms. Helf did so, it "produced the same predictable and violent reaction that occurred earlier that day."[37] As a result, Ms. Helf suffered acute and permanent neurological damage.[38] We concluded that the facts surrounding Ms. Helf's injury were sufficient to reasonably infer that her employer believed injury was virtually certain to occur.[39]

¶25 In so concluding, we focused on three factual circumstances alleged in Ms. Helf's complaint, which, when viewed in the light most favorable to her, demonstrated her employer believed injury

---

[31] *Id.* ¶ 7.

[32] *Id.* ¶ 8.

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.* ¶ 44.

[37] *Id.* ¶ 10.

[38] *Id.* ¶¶ 10–11, 44.

[39] *Id.* ¶ 44.

was virtually certain to occur.[40] First, Ms. Helf's employer was aware that the neutralization process was extremely dangerous because it had previously created a "violent reaction[]" on a prior occasion in a different setting.[41] Second, another employee engaged in the same neutralization process earlier in the day, which resulted in the same noxious purple cloud.[42] This noxious cloud set off safety alarms and caused employees hundreds of yards away to "fall ill and be sent home."[43] And third, we noted that after the earlier neutralization, Ms. Helf's employer failed to take any additional safety measures or inform her of the prior violent reaction that caused injury to others.[44]

¶26  Based on these factual circumstances, we held that Ms. Helf properly pled the intentional-injury exception because the "alleged facts . . . could convince a reasonable jury that her injuries were the expected result of re-initiating the neutralization process."[45] We note that our decision in *Help I* hinged heavily on the *recent history* of prior injury: just a few hours earlier, injuries were actually sustained when a different employee initiated a neutralization process the employer knew to be dangerous. With full knowledge that the dangerous process could in fact cause injury, the employer waited until nightfall and ordered Ms. Helf, an unsuspecting employee, to perform the same dangerous task under the same dangerous conditions, an order which "produced the same predictable and violent reaction that occurred earlier that day."[46] So under *Help I*, where an employer knows that a specific task previously caused injury to occur, assigns the same task to another employee, and then fails to make any changes that would create a different outcome, we can reasonably infer that the employer believed injury was virtually certain to occur. The allegations in the Christiansen parties' complaint do not rise to this level.

¶27 The Christiansen parties identify two surrounding circumstances that they allege support a reasonable inference that

---

[40] *Id.* ¶¶ 44–46.

[41] *Id.* ¶ 45.

[42] *Id.* ¶ 44.

[43] *Id.*

[44] *Id.*

[45] *Id.* ¶ 46.

[46] *Id.* ¶ 10.

Harrison Western believed injury was virtually certain to occur. First, they allege that Harrison Western knew a walking excavator, rather than a mini-excavator, was necessary to safely complete Mr. Christiansen's assigned project. Second, they allege that before the rollover, the mini-excavator slid down the mountain on multiple occasions—a fact of which Harrison Western was aware. We conclude that neither of these factual circumstances reasonably implies that Harrison Western believed injury was virtually certain to occur. As a result, the Christiansen parties fail to state a claim, and the district court did not err in granting Harrison Western's motion to dismiss.

*A. Harrison Western's Failure to Rent a Walking Excavator Does Not Support a Reasonable Inference That It Intended Mr. Christiansen's Fatal Injuries*

¶28 The Christiansen parties allege that Harrison Western believed injury was virtually certain to occur because it knew that a walking excavator, and not a mini-excavator, was necessary to safely complete Mr. Christiansen's assigned project. For support, the Christiansen parties point to UDOT's bid summary, which informed all bidders, including Harrison Western, that "special procedures relating to safety" were required based on the "steep and mountainous terrain." UDOT's bid summary further anticipated the need for a "walking excavator" for "digging the road and trenches for the [G]azex avalanche control units." The Christiansen parties further allege that Harrison Western represented it had "specialized expertise" based on its prior success in "performing construction in high angle and alpine environment" with "walking excavators," and was awarded the UDOT contract, in part, based on these representations. But Harrison Western's knowledge that a walking excavator, rather than a mini-excavator, was the proper equipment for the project and, consequently would increase safety, does not support the conclusion that Harrison Western believed injury was virtually certain to occur when it directed Mr. Christiansen to operate the mini-excavator.

¶29 As we have explained, in order to adequately plead the intentional-injury exception, it is not enough that an employee allege that an employer knew or appreciated risk.[47] And an allegation that an employer has subjected its employees to an unsafe work

---

[47] *See id.* ¶ 41.

environment because the employer failed to "provide . . . safety devices" is nothing more than such an allegation.[48]

¶30 In fact, Harrison Western's alleged conduct seems akin to "willful failure" explicitly addressed by section 34A-2-301 of the Act. That section penalizes employers for "requir[ing] or knowingly permit[ting]" employees to work in an unsafe work environment or for failing "to provide [appropriate] safety devices and safeguards."[49] So even though UDOT's bid summary and Harrison Western's previous experience suggest that Mr. Christiansen was working in an unsafe environment and that the walking excavator would have been safer, Harrison Western's conduct, as pled by the Christiansen parties, constitutes, at most, willful conduct that is covered by the Act.

¶31 In sum, the Christiansen parties' allegations regarding Harrison Western's failure to provide a safer working environment and safer equipment do not support a reasonable inference that Harrison Western believed Mr. Christiansen's injuries were virtually certain to occur. Instead, they suggest merely that Harrison Western knew or appreciated the risks surrounding Mr. Christiansen's work. In other words, the alleged facts suggest, at most, that Harrison Western's failures were the type of willful conduct explicitly covered by the Act. Accordingly, these allegations are insufficient to trigger the intentional–injury exception to the Act.

*B. The History of Prior Slides Does Not Create a Reasonable Inference That Harrison Western Intended Mr. Christiansen's Fatal Injuries*

¶32 The Christiansen parties also allege that Harrison Western believed injury was virtually certain to occur because Mr. Christiansen previously "slid down the mountain on multiple occasions." But this fact does not support the requisite reasonable inference because the prior slides did not result in injury and there is no alleged connection between the prior slides and the fatal rolling incident.

¶33 When employees seek to avail themselves of the intentional-injury exception, they must allege a direct connection between the prior incidents and the injury-producing incident that

---

[48] UTAH CODE § 34A-2-301(1)(c).

[49] *Id.* § 34A-2-301(1)(b)–(c).

rises above a mere probability of injury.[50] This is because where an employee alleges he or she was injured while engaged in a task that had previously caused a substantially similar injury in a substantially similar manner, and that the employer failed to take any measures to avoid the second injury, then a fact-finder could reasonably infer that the employer knew the second injury was virtually certain to occur.[51] For example, in *Help I*, we could directly connect the prior injury to Ms. Helf's injury: after the initial neutralization caused injury, the employer directed Ms. Helf to re-initiate the neutralization process in the same manner and under the same conditions.[52] And so we could reasonably infer that her employer expected the same result—an injurious occurrence.[53]

¶34 But where an employee alleges only that he or she was injured while engaged in a task that had previously led to incidents that came close to causing an injury, or otherwise indicate there was a risk of injury, the employee has suggested only that injury was probable, not virtually certain.[54] The Christiansen parties' allegations regarding previous slides fall into this category.

¶35 The Christiansen parties allege that Mr. Christiansen previously "slid down the mountain on multiple occasions" when he operated the mini-excavator on the mountainside and that after one of these slides, Eric Sowell, the Harrison Western project supervisor, sent Mr. Christiansen home. They also allege that, despite the previous slides, Harrison Western failed to mitigate the danger of

---

[50] *See Help I*, 2009 UT 11, ¶¶ 40–41, 44–46. Intent may not "be imputed where a high probability of injury exists because the employer knew that harm was substantially likely to occur sometime to some employee." *Id.* ¶ 40. To do so "would unravel the structure of the [Workers' Compensation] Act" as "[a]lmost every form of employment bears some risk of injury." *Id.*

[51] *Id.* ¶¶ 44–46.

[52] *Id.*

[53] *Id.*

[54] *See id.* ¶ 41 (stating that an injury is intentional if it is "a matter of *when* [the injury] would happen (a certainty)," and not "a question of *if* it would [happen] (a probability)" (alterations in original) (citation omitted)).

future slide-offs or rolls because it failed to provide the proper equipment to safely complete the project.

¶36  On appeal, the Christiansen parties equate their allegation of a history of slides to the history of prior injury in *Helf I*. But these facts are not equivalent: in *Helf I*, the key fact was the history of prior *injury*, not the history of a prior *risk* of injury.[55] A task that carries some risk of injury, but has never resulted in injury, cannot be virtually certain to cause injury without additional factual support. And here, Mr. Christiansen used the mini-excavator on multiple occasions without incident or injury. So while we can reasonably infer that a history of prior slides meant there was a risk of injury, without more, we cannot infer that injury was virtually certain.

¶37 We further conclude that the fact that the excavator had previously slid down the hill does not mean that Mr. Christiansen's rollover injury was virtually certain to occur. The Christiansen parties argue that the history of slides would allow a fact-finder to reasonably infer that the mini-excavator would one day roll. So, according to them, because the prior slides show that the excavator was more likely to roll, and an injury is virtually certain to occur when an excavator rolls, a fact-finder could reasonably infer that Harrison Western believed injury was virtually certain to occur when it directed Mr. Christiansen to continue excavation the day he was killed. But this argument falls short.

¶38 The fact that Mr. Christiansen used the excavator on multiple occasions without injury, and without the excavator rolling over, strongly supports the conclusion that Harrison Western did not believe Mr. Christiansen's rollover injury was virtually certain. After multiple slides that did not cause injury, Harrison Western directed Mr. Christiansen to operate the excavator in the same manner and under the same conditions. Although on this final occasion, the excavator rolled, which resulted in Mr. Christiansen's fatal injuries, this was a very different result than what had occurred with the prior slides. Based on these facts, a fact-finder could not reasonably infer that Harrison Western believed the excavator was virtually certain to cause Mr. Christiansen's injuries.

¶39 In sum, the facts alleged in the Christiansen parties' complaint do not reasonably imply that Harrison Western believed Mr. Christiansen's injuries were virtually certain to occur. In other words, Harrison Western's failure to rent the proper equipment and

---

[55] *See id.* ¶ 44.

its knowledge of the excavator's previous slides suggest that, at most, Harrison Western was grossly negligent but did not act intentionally. As a result, the district court did not err in granting Harrison's Western's 12(b)(6) motion.

## II. The Christiansen Parties' Proposed Second Amended Complaint Is Futile Because It Fails to Withstand Harrison Western's Motion to Dismiss

¶40 The Christiansen parties also argue the district court erred in denying their motion to amend. They argue they properly pled the intentional-injury exception in their proposed Second Amended Complaint, and so their request to amend was not futile. Because the allegations in the proposed Second Amended Complaint do not meet the intentional-injury exception, and thus do not withstand Harrison Western's 12(b)(6) motion to dismiss, we disagree. As a result, we affirm.

¶41 When a plaintiff requests leave to amend its complaint, "the court should freely give permission when justice requires."[56] But justice "does not require that leave be given 'if doing so would be futile.'"[57] A motion to amend is "futile if the proposed amendment would not withstand a motion to dismiss . . . ."[58]

¶42 In their proposed Second Amended Complaint, the Christiansen parties include a number of facts that were not included in their first complaint. They argue these facts support their conclusion that the intentional-injury exception applies. First, they provided details of the contract between UDOT and Harrison Western, including UDOT's anticipation that a walking excavator was needed based on the project's steep terrain. Second, they added that Harrison Western knew a walking excavator was needed based on its extensive experience with similar projects. And third, they alleged that Harrison Western failed to take additional safety precautions after the excavator slid on prior occasions.

¶43 We conclude that, even when these additional factual details are considered, the allegations in their complaint were insufficient to withstand a motion to dismiss. Accordingly, the Christiansen

---

[56] UTAH R. CIV. P. 15(a)(2).

[57] *Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶ 139, 82 P.3d 1076 (citation omitted).

[58] *Id.* (citation omitted).

parties' proposed Second Amended Complaint was futile.[59] As a result, we affirm the district court's denial of the Christiansen parties' motion to amend.

## Conclusion

¶44 We hold that the Christiansen parties fail, in their original complaint, to allege sufficient facts to support a reasonable inference that Harrison Western believed Mr. Christiansen's fatal injuries were virtually certain to occur. As a result, their claims do not fall within the intentional-injury exception to the Workers' Compensation Act. Their claims are therefore barred by the Act and the district court's dismissal of their complaint was proper. We also hold that the Christiansen parties' proposed amendment to their complaint was futile because, even when the additional factual allegations in the amended complaint are considered, they do not support application of the exception. For this reason, the Christiansen parties' request for leave to amend was futile, and the district court did not err in denying it. Accordingly, we affirm the district court on both points.

_____

[59] *See id.*

ASSOCIATE CHIEF JUSTICE LEE, concurring:

¶45 The Workers' Compensation Act has long provided that an administrative action under the statute is the "exclusive remedy" for any "injuries sustained . . . on account of any accident or injury or death, in any way contracted, sustained, aggravated, or incurred by the employee in the course of or because of or arising out of the employee's employment." UTAH CODE § 34A-2-105(1). This remedy is exclusive even "when injury is caused by the willful failure of an employer to comply with . . . the law." *Id.* § 34A-2-301(2)(a). A showing of willfulness increases the employee's statutory compensation by 15 percent; it does not remove the case from the workers' compensation regime. *Id.*

¶46 Notwithstanding these provisions, this court long ago adopted an intentional-injury exception to the exclusive remedy provision of the Workers' Compensation Act. *See Bryan v. Utah Int'l*, 533 P.2d 892 (Utah 1975). In the *Bryan* case, the majority held that the Workers' Compensation Act does not insulate an employer from liability for a "wrongful act" that is "not only done knowingly," but "intentionally" in the sense of being done "with the knowledge that it was wrongful to do it." *Id.* at 894 (citations omitted). The *Bryan* majority thus suggested the existence of a distinction between "intentional" and "willful" conduct—asserting that "[t]he definition of the word 'intentional' is more compact than is that of the word 'willful,'" and concluding that a tort claim remains open to an employee who can establish that an employer has acted intentionally. *Id.*

¶47 The *Bryan* majority position was challenged in a dissent. The dissent highlighted the broad, "all inclusive" terms of the statute's exclusive remedy provision—a provision making a workers' compensation action the sole remedy for all claims for "any accident or [any] injury" sustained in the course of employment. *See id.* at 895 (Crockett, J., dissenting) (alteration in original) (quoting UTAH CODE § 35-1-60). And it suggested that this "mandate" should be followed notwithstanding any "moral" objections the court might have. *Id.*

¶48 Our subsequent case law has applied, explained, and narrowed the intentional-injury exception established in *Bryan*. We have held that a common-law tort claim is available only for conduct "beyond gross negligence or willful conduct"—conduct that is "intentional" in the sense that the employer not only knew of a risk of harm to an employee but either "desired" the imposition of such harm or believed that it was "virtually certain" to occur. *Supra* ¶¶ 17–20 (citing cases). This "virtually certain" standard is at issue in

this case. And the majority adds important clarity to the standard in our case law, explaining that it is not enough for an employer to have "'knowledge or appreciation of risk'" in the workplace in general. *Supra* ¶ 21. Instead, the employer must have the knowledge or expectation of a "history of prior *injury*, not the history of a prior *risk* of injury." *See supra* ¶ 36. "A task that carries some risk of injury, but has never resulted in injury, cannot be virtually certain to cause injury without additional factual support." *Supra* ¶ 36.

¶49 This is an important clarification. It is crucial to maintaining a distinction between "intentional injury" under our cases and "grossly negligent" or "willful" conduct, which are expressly covered by the Workers' Compensation Act.

¶50 I concur in the court's opinion in full. I do so despite my conclusion that the dissent in the *Bryan* case "had the better of the argument" under the statute as a matter of first-impression. *Helf v. Chevron U.S.A. Inc.*, 2015 UT 81, ¶ 92 n.1, 361 P.3d 63 (Lee, A.C.J., dissenting). This has been and is still my view. But I concur fully in the majority opinion on the basis of the doctrine of *stare decisis*.

¶51 The "rule of law" would be impossible without a doctrine of *stare decisis*. *State v. Wilder*, 2018 UT 17, ¶ 19, 420 P.3d 1064. Our courts would be pressed "almost to the breaking point if every past decision could be reopened in every case." BENJAMIN N. CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 149 (1921). For that reason, our case law has long endorsed a presumption of deference to past precedent. *See Eldridge v. Johndrow*, 2015 UT 21, ¶ 21, 345 P.3d 553.

¶52 The presumption, of course, is rebuttable. No one views our precedent as cemented permanently in place. The key question thus goes to the standards for rebutting the presumption of deference to our past decisions.

¶53 Our case law has identified "two broad factors" that we apply to "distinguish between weighty precedents and less weighty ones: (1) the persuasiveness of the authority and reasoning on which the precedent was originally based, and (2) how firmly the precedent has become established in the law since it was handed down." *Eldridge,* 2015 UT 21, ¶ 22. These factors are a good starting place for the *stare decisis* inquiry. But they leave open some key points of indeterminacy—in the way the factors are defined and in how they interact with each other.

¶54 This is a gap in our doctrine as it now stands. In an appropriate case, we should fill the gap by clarifying these points. Until we do so, we will not be fully fulfilling the aspirations of a "law of precedent"—a statement of a set of rules that restrain

"judicial discretion" and "promote[] public confidence in the judiciary." *Wilder*, 2018 UT 17, ¶ 19. And we will leave ourselves open to the concern that we may be shaping the factors in one way when we wish to preserve our precedent and in another when we decide to overrule it.

¶55 My colleagues have challenged my approach to *stare decisis* in a few recent cases. They have asserted that I have been too "willing" to "uproot" our precedent[60] and suggested that my approach "doesn't respect" the doctrine of *stare decisis*.[61] I disagree with these critiques. Yet I concede that my own writing to date has left some aspects of my position on the *stare decisis* standard unstated.

¶56 I write separately here to state my view more clearly. I first highlight some elements of our Utah standards of *stare decisis* that are as yet unresolved. Second, I identify some historical material that could help clarify and refine our doctrine in a manner that can better restrain our judicial discretion going forward. Third, I close by explaining how my decision to defer to our *Bryan* line of cases flows directly from the historical standards that are most firmly rooted in historical practice.

I

¶57 Our case law has identified "two broad factors" that guide our judgment in distinguishing the "weighty" precedents worthy of substantial deference from the "less weighty" ones more susceptible to overruling: (1) the "persuasiveness" of a prior decision and (2) "how firmly" it "has become established in [our] law." *Eldridge v. Johndrow*, 2015 UT 21, ¶ 22, 345 P.3d 553. These are important starting points that align with standards prescribed by the United States Supreme Court and other bodies.[62] But in our court, as

---

[60] *Blanke v. Utah Bd. Pardons & Parole*, 2020 UT 39, ¶ 11 n.6, 467 P.3d 850.

[61] *Neese v. Utah Bd. Pardons & Parole*, 2017 UT 89, ¶ 57, 416 P.3d 663; *see also State v. Rowan*, 2017 UT 88, ¶¶ 25–26, 416 P.3d 566 (contending that I "disagree[]" with the idea that we should "pay it forward" by giving "appropriate respect for past courts").

[62] *See, e.g., Ramos v. Louisiana*, 140 S. Ct. 1390, 1414–16 (2020) (Kavanaugh, J., concurring in part) (explaining that Supreme Court precedent requires a "special justification" to overrule a constitutional precedent, which typically entails considering whether

elsewhere, these starting points leave open some gaps—imprecision in the content of the two factors, and indeterminacy in the interplay between them.[63]

¶58 We have long said that we start by looking to the "persuasiveness" of a prior decision but have not been clear on what we mean by that. Sometimes we treat this factor as an inquiry into whether our past cases reached results that we view as correct in light of our own contemporary analysis.[64] In other cases, we seem to

---

the prior decision was "egregiously wrong," has "caused significant negative jurisprudential or real-world consequences," and whether "overruling the prior decision [would] unduly upset reliance interests"); BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT 39 (2016) ("When an en banc court decides whether to depart from or overrule en banc precedent, it considers the same factors weighed by the Supreme Court."); *Morrow v. Balaski*, 719 F.3d 160, 180 (3d Cir. 2013) (Smith, J., concurring) (identifying as factors followed by at least nine other circuits the consideration of whether a precedent is "clearly wrong" and whether it has "generated . . . serious reliance interests").

[63] Our standards of *stare decisis* may not be susceptible to a level of "algorithm[ic]" precision. *See infra* ¶ 84. But we can and should address inconsistencies in our doctrine, just as we can define the elements of our test with greater precision, and explain more precisely how the "factors" in our test interact with each other. On the latter point, we can ultimately conclude that the "values" at stake are simply too "incommensurate" to be reduced to a rule-like standard. *Infra* ¶ 86 (quoting Jill E. Fisch, *The Implications of Transition Theory for Stare Decisis*, 13 J. CONTEMP. LEGAL ISSUES 93, 107–08 (2003)). To date, however, our court has not done that. It has articulated a two-factor "test" that seems to be rule-like but reserves significant discretion through points of imprecision. This is the concern I am addressing—the gap that I seek to fill through an historical lens.

[64] *See, e.g.*, *Mitchell v. Roberts*, 2020 UT 34, ¶¶ 24, 26, 469 P.3d 901 (noting that our cases had "sent mixed signals," but also explaining that statements corresponding with our holding were "entitled to respect as a matter of *stare decisis*" in part because "we [were] persuaded that these statements . . . [were] consistent with the original understanding of our state constitution" based on our analysis); *id.* ¶ 26 (calling cases that "suggest[ed] otherwise . . . unpersuasive departures from the original meaning of

suggest that the inquiry is more concerned with whether the prior opinion took a hard look at the question in reaching its decision.[65]

¶59 A similar imprecision appears in our analysis of the second factor identified in our cases—as to "how firmly the precedent has become established in the law since it was handed down." *Eldridge*, 2015 UT 21, ¶ 22. On this factor, we have noted that myriad "considerations" can come into play, "including the age of the precedent, how well it has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned." *Id.* We have identified a broad range of "reliance" interests and "hardship[s]" of relevance to this inquiry, but stopped short of specifying the nature of the relevant reliance interests or clarifying the relative weight to be given to any such interests.[66] And

our state charter"); *Taylorsville City v. Mitchell*, 2020 UT 26, ¶ 34, 466 P.3d 148 (explaining that a prior decision was "in line with our analysis today" and was therefore "persuasive[]" (citation and internal quotation marks omitted); *State v. Sanders*, 2019 UT 25, ¶ 38, 445 P.3d 453 (referencing persuasiveness as an inquiry into whether "we would decide a case differently if we were writing on a tabula rasa"); *State v. Wilder*, 2018 UT 17, ¶ 20–24, 420 P.3d 1064 (overruling two past cases because those decisions "[sat] on cracked legal footings" because they ignored and "effectively supplant[ed]" an on-point statute and relied on a constitutional concern grounded in a misunderstanding of the constitutional law).

[65] *See Sanders*, 2019 UT 25, ¶ 37 (explaining that a prior case did "not inspire much respect" because it had not analyzed the text of a relevant statute or looked at on-point statutory definitions); *State v. Guard*, 2015 UT 96, ¶ 48, 371 P.3d 1 (explaining that a rule repeatedly applied by this court was unpersuasive because it made its initial appearance "in dicta and [we had] failed to subsequently analyze it in a meaningful way").

[66] *See Taylorsville*, 2020 UT 26, ¶ 35 (identifying institutional reliance within the government as a worthy consideration in the *stare decisis* analysis); *State v. Robertson*, 2017 UT 27, ¶ 37, 438 P.3d 491 (identifying "contractual, property, or similar vested rights" as reliance interests that should be considered); *id.* ¶ 36 (suggesting that "wide[] accept[ance]" of a precedent as evidenced by provisions in "mortgages and trust deeds" would be significant evidence of reliance (citation and internal quotation marks omitted)); *id.* ¶ 34 (suggesting that judicial reliance may also form part of the inquiry

we have not indicated whether our standard requires reliance in the form of concrete ordering of a person's legal affairs (such as by writing a contract or will) or whether widespread acceptance of our past statements as "the law" might be sufficient.

¶60 We have also stopped short of indicating how the two *Eldridge* factors are supposed to interact with each other. And we have compounded this problem by sometimes introducing a third factor. *See State v. Robertson*, 2017 UT 27, ¶ 30, 438 P.3d 491 ("*We consider at least three factors* when deciding whether to overrule a prior interpretation of a statute": the two factors listed in *Eldridge* "and the strength of the arguments for changing that interpretation." (emphasis added)). The third factor mentioned in the *Robertson* case is a malleable one. It asks whether there are "policy arguments" or "practical factors" that tell us whether "more good than harm will come by departing from precedent."[67] *Id.* ¶ 38 (citations and internal quotation marks omitted).

¶61 These are all concerns for a doctrine that seeks to cabin judicial discretion and promote decisionmaking by the rule of law. These goals suggest the need to clarify the content of the *Eldridge* factors and explain how the factors interact. Our pursuit of

_____

because "[u]ltimately, we are concerned with whether overruling our precedent would upend broad swaths of the legal landscape"); *Eldridge v. Johndrow*, 2015 UT 21, ¶ 35–36, 345 P.3d 553 (explaining only that people "ought not . . . have" "their legal rights . . . as defined by judicial precedent" "swept away by judicial fiat" after "having conducted their affairs in reliance on such rights" (citations omitted)); *Guard*, 2015 UT 96, ¶ 60 (noting that "the State's [reliance] interests are certainly important" but explaining that "they are not the type of public reliance interests we traditionally protect most strongly"); *Scott v. Universal Sales, Inc.*, 2015 UT 64, ¶¶ 23, 32, 356 P.3d 1172 (overruling a case that limited potential liability for "correctional facilities and health care providers that regularly house dangerous individuals" for the actions of those in their custody "despite the reliance interests of hospitals and correctional facilities" without specifically identifying how those entities had relied on our prior decision).

[67] *Eldridge* uses the language of "more good than harm . . . com[ing] by departing from precedent," but it does not state this as an independent factor. 2015 UT 21, ¶ 64. Nor does *Eldridge* suggest that we should consider "policy arguments" or "practical factors" as the *Robertson* case does.

predictability by the rule of law also cuts against the declaration in *Robertson* that there is a third factor that reserves discretion on whether "more good than harm" will come from overruling, as that seems to be an assertion that we retain the unfettered prerogative of deciding how we treat our precedent.

## II

¶62 In the paragraphs below I first present some historical material of relevance to the above-noted points of imprecision in our *Eldridge* line of cases. I then outline how I would refine our law of *stare decisis* by adopting at least some of the deeply rooted elements of the historical doctrine of *stare decisis*. Finally, I highlight some important upsides of providing greater clarity in our doctrine of *stare decisis*—upsides that in my view outweigh some admitted downsides.

### A

¶63 History can inform and refine our approach to the doctrine of *stare decisis* on all three of the points of imprecision in our case law.

#### 1

¶64 Historically, the threshold *stare decisis* inquiry centered on whether a prior decision was "demonstrably erroneous"— objectively wrong in the sense of being a clear departure from the ordinary meaning of a governing statute or constitutional provision. Where a past decision was not *demonstrably* erroneous, courts were bound by it. But a decision shown to be not just wrong but *demonstrably* so was more open to reconsideration.

¶65 Two key concepts informed the historical inquiry into whether an alleged error in a past decision was *demonstrable*: (1) the degree of indeterminacy of many written laws and (2) the resulting need to resolve ambiguous language. Courts and legal theorists recognized that a certain level of ambiguity or vagueness in written laws was unavoidable in light of the inherent indeterminacy of language.[68] And they "believed that precedents would operate"

---

[68] As James Madison put it in *Federalist* 37, the "cloudy medium" of legal text often involved "a certain degree of obscurity" because "[a]ll new laws . . . are . . . more or less obscure." THE FEDERALIST NO. 37 (James Madison). In light of this indeterminacy, Madison and others recognized that "difficulties and differences of opinion might

within the "range of indeterminacy" in written laws to resolve points of ambiguity and vagueness.[69]

¶66 The upshot was that not all precedents were afforded the same weight. "[W]hen the early interpreters of a statute or constitutional provision that was obscure or 'controverted' gave it a permissible construction, they helped to 'settle its meaning'" and bound "subsequent interpreters . . . even if [the subsequent interpreters] would have adopted a different [construction] as an original matter."[70] But if "subsequent interpreters remained convinced that a prior construction went beyond the range of indeterminacy, they did not have to treat it as a valid gloss on the law."[71]

¶67 This framework was "remarkably widespread"[72] and reigned throughout the nineteenth century, including during the framing of our Utah Constitution.[73] This court and its territorial

occasionally arise[] in expounding terms and phrases" with "doubtful or contested meanings." *See* William Baude, *Constitutional Liquidation*, 71 STAN. L. REV. 1, 14 (2019) (citations and internal quotation marks omitted).

[69] Caleb Nelson, Stare Decisis *and Demonstrably Erroneous Precedents*, 87 VA. L. REV. 1, 11 (2001).

[70] *Id.* at 13 (citation omitted).

[71] *Id.* at 14.

[72] *Id.* at 18–19.

[73] The assumption that past erroneous decisions should ordinarily be corrected by later courts "can [be] trace[d] . . . from the 1780s through the Civil War and beyond." *Id.* at 16. *See, e.g.*, *Trebilcock v. Wilson*, 79 U.S. 687, 692 (1871) (overruling a decision that had "overlooked the third clause" of an applicable statute); *Lemp v. Hastings*, 4 Greene 448, 449–50 (Iowa 1854) (explaining that precedent "should not be overruled[] unless it is palpably wrong"); Nelson, *supra* note 69, at 15 n.46 (quoting *Breedlove v. Turner*, 9 Mart. (o.s.) 353, 366–67 (La. 1821)) (explaining that past decisions were binding "unless we are clearly, and beyond doubt, satisfied that they are contrary to law or the constitution"); *Bush v. Bradley*, 4 Day 298, 309–10 (Conn. 1810) (N. Smith, J., concurring) ("On a doubtful point, I should consider myself bound by [the prior case]; but as the statute, in my judgment, is perfectly plain, I am constrained to say that its obligations are paramount to any precedent, however respectable."); H. Campbell Black, *The Principle of Stare Decisis*, 25 THE AM. L. REG.

antecedent both embraced this framework.[74] And the framework remained widely popular for some time after our state's founding.[75]

2

¶68 In historical doctrine, "[j]udges frequently indicated that if past decisions had established 'rules of property'—if titles had passed in reliance on them or if people had otherwise conducted transactions in accordance with them—the resulting reliance interests could provide a reason to adhere to the decisions even if they were now deemed erroneous."[76] This is a form of what is sometimes referred to as "specific reliance."[77] To this day, the law of

---

745, 745 (1886) (explaining that "judges [were] bound to follow [precedent] . . . unless it [could] be shown that the law was misunderstood or misapplied"); J.C. WELLS, A TREATISE ON THE DOCTRINES OF RES ADJUDICATA AND STARE DECISIS 579 (1879) (Courts "do not violate [*stare decisis*] when [they] declare that a [past decision] in opposition to all previous legislation . . . is open to correction.") (citation and internal quotation marks omitted)).

[74] *Whittemore v. Cope*, 40 P. 256, 259 (Utah 1895) ("[S]tare decisis ought to be invoked . . . when there [wa]s nothing manifestly erroneous in the [past] decision."); *Kimball v. City of Grantsville*, 57 P. 1, 8–9 (Utah 1899) (explaining that a "series of decisions settling a question of law" would merit strong deference except when we found a "clear manifestation of error," or "where it [wa]s manifest that the law ha[d] been erroneously decided").

[75] *See, e.g.*, THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 70 (7th ed. 1903) (returning to the theme of "[t]he deficiencies of human language" when teeing up its discussion of interpretation, construction, and *stare decisis* and saying "these circumstances" together gave "interpretation and construction great prominence in the . . . law").

[76] Nelson, *supra* note 69, at 20 (footnote omitted); *see also Marine Ins. Co. of Alexandria v. Tucker*, 7 U.S. (3 Cranch) 357, 388 (1806) (per Washington, J.) ("[I]n questions which respect the rights of property, it is better to adhere to principles once fixed . . . than to unsettle the law[] in order to render it more consistent with the dictates of sound reason.").

[77] *See* Randy J. Kozel, Stare Decisis *as Judicial Doctrine*, 67 WASH. & LEE L. REV. 411, 452–64 (2010) (identifying this and three other categories of reliance interests discussed in the case law).

*stare decisis* gives this kind of reliance special weight. Courts routinely hold that "precedent that creates a rule of property—a widely relied-on legal principle established by a judicial decision or series of decisions relating to title to real, personal, or intellectual property—is generally treated as inviolable." BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT 421 (2016).

¶69 Over time, the law of *stare decisis* sometimes has been extended to encompass other categories of reliance interests—interests that include "governmental reliance," meaning "reliance by Congress, the executive branch, or another governmental unit"; "doctrinal reliance," meaning "reliance by the judiciary itself that arises when many cases depend upon a foundational precedent;" and "societal reliance," which has reference to "the effect of the precedent on shaping societal perceptions."[78] But these sorts of interests are not consistently credited in the case law.[79] And they are more difficult to define or to weigh in any consistent fashion.[80]

3

¶70 In historical practice, courts seem to have mediated the tension between the prerogative of overruling demonstrably erroneous precedents and the concern for reliance interests through something of a sliding scale.[81] On one side of the scale, courts

---

[78] Alexander Lazaro Mills, Note, *Reliance by Whom? The False Promise of Societal Reliance in Stare Decisis Analysis*, 92 N.Y.U. L. REV. 2094, 2102–04 (2017) (citations and internal quotation marks omitted).

[79] *See* Michael Stokes Paulsen, *Does the Supreme Court's Current Doctrine of Stare Decisis Require Adherence to the Supreme Court's Current Doctrine of Stare Decisis?*, 86 N.C. L. REV. 1165, 1182 (2008) (noting that the United States Supreme Court "sometimes accords social reliance significant weight and sometimes it does not").

[80] Most any precedent can be said to shape our "doctrine" or "perceptions" of our "society" to some degree. And that leaves nearly unlimited discretion to decide whether or not a body of precedent should be preserved or set aside.

[81] *See* WELLS, *supra* note 73, at 543, 545 (speaking of a balance of a "duty in a court to adhere to decisions which have become a rule of property," especially "in regard to the purchase or sale of real estate," and the need for a court to correct a decision that is found to be "unbearably wrong").

considered the *degree* to which a prior decision was "demonstrably erroneous"—just *how* "unfounded in law" and "unreasonable" its attempt to interpret a statute or constitutional provision had been.[82] The further a decision departed from the mandate of a written law, the more weight courts would place on the scale in favor of overruling that decision. On the other side of the scale, courts considered the extent to which "the point" established in a case had "become a rule of property, so that titles have been acquired in reliance upon it, and vested rights [would] be disturbed by any change."[83] The more extensive the reliance at stake, the stronger the argument against overruling would become.[84] Early Utah case law is again in accord.[85]

B

¶71 I would refine our law of *stare decisis* by adopting at least some of the elements of the historical framework outlined above. At a minimum, I would clarify (1) that our inquiry into the "persuasiveness" of our precedent should turn on whether a past decision is "demonstrably erroneous,"[86] (2) that a precedent that sustains "specific reliance" interests merits strong deference, and (3) that the foregoing considerations are balanced on a sliding scale in

---

[82] COOLEY, *supra* note 75, at 86.

[83] *Id.*

[84] Even with respect to rules of property, "sometimes decisions are so wrongly decided—and the cost of continuing to enforce the established rule so great—that courts may jettison them." BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT 431 (2016).

[85] Though it did not discuss a specific framework for weighing reliance interests, the *Kimball* case referred not only to the prerogative of overruling a precedent "where it is manifest that the law has been erroneously decided," but also to the need to protect "material property rights or business rules . . . established thereunder." *Kimball*, 57 P. at 8.

[86] I am not suggesting that all judges will "agree" in our assessment of whether "a precedent is demonstrably erroneous." *Infra* ¶ 88. I am simply proposing that we resolve a point of imprecision in our case law, by articulating a *standard* for judging the "persuasiveness" of a past decision.

which the showing of demonstrable error must be stronger where the reliance interests at stake are greater.

¶72 These considerations are deeply embedded in the historical case law outlined above—including in our Utah cases. And they can advance the interests of transparency and constraint on our discretion without eliminating elements of discretion that are necessary or inevitable.

¶73 I leave for a future date the question of how to handle a number of other problems highlighted in my historical discussion above. I stop short of addressing, for example, the question of how to more precisely define categories of reliance interests ("governmental," "doctrinal," and "societal" reliance), and the question of how those reliance interests should be accounted for in weighing the factors under *Eldridge*. These and other questions are less clearly established in the historical case law. And they are not implicated by my decision in this case. So I leave them for another day.

C

¶74 I am not suggesting that the historical approach to *stare decisis* is required as a matter of our constitutional judicial power.[87] Nor am I asserting that the historical formulation eliminates all discretion from the *stare decisis* analysis. Even under the clarification that I propose, judges will still differ on whether a precedent is "demonstrably erroneous," on how much weight to give to certain "reliance interests," and on how the "sliding scale" analysis plays out in a given case. That said, I think history is often a good guide when we encounter points of imprecision in our law. And I think the historical formulation can reduce the degrees of freedom available to a court even if it doesn't eliminate discretion altogether—an important upside to the clarification that I have in mind.

---

[87] The standards I set forth here are also necessarily tentative. In a future case, I welcome further briefing and argument about how this court and I can further define a transparent and discretion-limiting law of precedent. Until that day arrives, I am stating here the principles that have informed and will guide my approach to *stare decisis*. This may constrain my vote on whether to uphold or overturn precedent in future cases. But that is, or should be, the point of a law of precedent.

¶75 The clarification that I have in mind admittedly gives rise to downsides. If and when we move to increase the clarity of the content and operation of our standard of *stare decisis*, we will be detracting from the flexibility of the doctrine and limiting the discretion afforded to the judges who apply it.

¶76 Reasonable minds can differ on whether the upsides of clarification outweigh the downsides. The "rules versus standards" debate has long raged throughout our law.[88] And I can see the argument for a more standard-like law of *stare decisis*.

¶77 That said, I am inclined to see more upside than downside in clarification of our law in this field. The doctrine of *stare decisis* is aimed at enhancing the stability of our law and inspiring confidence in the impartiality of the judiciary—by ensuring that our law does not duck and swerve with changes in judicial personnel.[89] And our doctrine will fall short of those ideals if we fail to clarify the points of imprecision that I have highlighted.

III

¶78 In *Bryan* and its progeny, this court has identified and filled in an ambiguity in the Workers' Compensation Act's use of the word "willful." The question is whether the legislature left open the possibility of tort recovery for "intentional" acts or omissions despite its indication that "willful" conduct is covered exclusively under the Act. *See* UTAH CODE § 34A-2-301(2). The *Bryan* majority highlighted a point of ambiguity in asserting that the statute does not "deal directly with intentional acts." *Bryan v. Utah Int'l*, 533 P.2d 892, 894 (Utah 1975). And it stated that the term "'intentional' is more compact than is that of the word 'willful'" and held that an "intentional" act falls outside the statute because it applies to an "act

---

[88] *See State v. Rushton,* 2017 UT 21, ¶ 71, 395 P.3d 92 (Lee, A.C.J., concurring) (noting that "[a] totality-of-the-circumstances test is a tempting response to a complex legal problem" and "may have a place in the law—in a field, for example, where precision is untenable (or unimportant) and flexibility is at a premium," while also explaining that "[t]he flipside of flexibility is unpredictability"); *id.* ¶ 71 n.11 (citing a "rich literature on the virtues and vices of objective rules and subjective standards").

[89] *See* BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT 415 (2016) ("[S]tare decisis dictates that a precedent shouldn't be overruled simply because new judges populate the court.").

[that] was not only done knowingly, but with the knowledge that it was wrongful to do it." *Id.*

¶79 I have stated previously that the dissent in *Bryan* "seems to have had the better of the argument." *Helf v. Chevron U.S.A. Inc.*, 2015 UT 81, ¶ 92 n.1, 361 P.3d 63 (Lee, A.C.J., dissenting). That is still my view. But I nonetheless vote to uphold the *Bryan* line of cases despite the fact that I would have dissented from the *Bryan* decision if the question had been presented to me in the first instance. My decision in this case flows directly from the historical clarifications outlined above. First, the *Bryan* line of cases is not a "demonstrably erroneous" departure from the law but a plausible resolution of a point of ambiguity in our law. Second, our holdings in these cases sustains substantial elements of "specific reliance." The *Bryan* line of decisions establishes a "square and straightforward" standard (made even more so by the important opinion handed down today) that has given rise to "substantial reliance interests on the part of employees and employers." *Id.* ¶ 92.

¶80 These are sufficient grounds for deference to the *Bryan* line of decisions under the points of clarification to our *Eldridge* factors outlined above. I concur in the majority opinion on this basis.

---

JUSTICE HIMONAS, concurring:

¶81  I concur fully with the Chief Justice's well-reasoned opinion. I write separately only to respond to the Associate Chief Justice's concurring opinion. I disagree both with his substantive view of our stare decisis doctrine and with the way he expresses that view today. I begin with an overview of this court's established stare decisis framework and then explain why his suggestions are unnecessary and detrimental.

¶82 "Stare decisis is a cornerstone of Anglo–American jurisprudence because it is crucial to the predictability of the law and the fairness of adjudication. Because stare decisis is so important to the predictability and fairness of a common law system, we do not overrule our precedents lightly." *Eldridge v. Johndrow*, 2015 UT 21, ¶ 21, 345 P.3d 553 (citations omitted) (internal quotation marks omitted). To further the goals of predictability and fairness, this court has over time developed many principles guiding when to overrule and when to respect precedent.

¶83 Relatively recently, we distilled these established stare decisis principles into "two broad factors." *Id.* ¶ 22. We consider: "(1) the persuasiveness of the authority and reasoning on which the precedent was originally based, and (2) how firmly the precedent has become established in the law since it was handed down." *Id.* We have explained that the first factor is contextual; our persuasiveness analysis necessarily depends on the relevant source of law.[90] "The

---

[90] For example, "[i]n the context of statutory interpretation, [it] means we consider whether the prior interpretation is []reasonable given the statutory framework in existence at that time." *Rutherford v. Talisker Canyons Fin., Co.*, 2019 UT 27, ¶ 28, 445 P.3d 474 (third alteration in original) (citation omitted) (internal quotation marks omitted); *see also State v. Sanders*, 2019 UT 25, ¶ 37, 445 P.3d 453 (explaining that a precedential decision did "not inspire much respect" because, in analyzing a firearm possession statute, "we never referenced [the statute's] text, parsed the Utah Criminal Code's general definition of 'possess,' or analyzed whether the plain language left room for an affirmative defense" (citation omitted)). And in the common-law context, we have considered (again, for example) whether a decision "rests on a firm legal footing" based on how well the decision characterized the rationale of previous cases and the weight of authority behind that rationale. *C.R. England v. Swift Transp. Co.*, 2019 UT 8, ¶¶ 29–31, 437 P.3d 343.

second factor encompasses a variety of considerations, including the age of the precedent, how well it has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned." *Id.*

¶84 Still, I recognize that stating our doctrine of stare decisis is the easy part. Applying the doctrine is the hard part—the hard work we expect appellate judges to do. Balancing the factors is a "difficult, slippery, and intimidating inquir[y]." Randy J. Kozel, *Stare Decisis as Judicial Doctrine*, 67 WASH. & LEE L. REV. 411, 466 (2010). And application of the doctrine "will always remain part art and part science. We should not expect it to become the stuff of algorithm." *Id.* A decision to overrule precedent is rarely taken lightly or approached rashly. Past decisions form the foundation of our jurisprudence. An imprecise or poorly considered attempt to renovate that foundation can have profound and unseen impacts on the integrity of our case law. *See, e.g.*, John Paul Stevens, *The Life Span of a Judge-Made Rule*, 58 N.Y.U. L. REV. 1, 4 (1983) ("The framework for most Court opinions is created by previously decided cases.").

¶85 Nevertheless, this court has embraced the hard work and consistently applied *Eldridge* without significant trouble. *See, e.g.*, *Rutherford v. Talisker Canyons Fin., Co.*, 2019 UT 27, ¶¶ 31–74, 445 P.3d 474 (going through persuasiveness in depth, before turning to our "firmly established" factors and analyzing them); *State v. Sanders*, 2019 UT 25, ¶ 38, 445 P.3d 453 (noting the interplay between the *Eldridge* factors); *id.* ¶¶ 36–42 (analyzing the *Eldridge* factors); *C.R. England v. Swift Transp. Co.*, 2019 UT 8, ¶¶ 28–39, 437 P.3d 343 (analyzing the *Eldridge* factors in the same order and in some depth). These decisions present different depths of analysis because they reflect different problems—problems with the precedent at issue, problems due to different levels of briefing, or problems stemming from disagreement between members of this court.

¶86 The *Eldridge* framework is not algorithmic by design. It necessarily balances the competing goals of predictability and flexibility. *See Am. Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167, 205 (1990) (Scalia, J., concurring) ("[T]he doctrine of *stare decisis* is a flexible command."); Jill E. Fisch, *The Implications of Transition Theory for Stare Decisis*, 13 J. CONTEMP. LEGAL ISSUES 93, 107-08 (2003) ("How does one weigh the adverse impact posed by a bad or erroneous decision against the systemic harm created by too-frequent overruling? The Court is being asked to weigh competing yet incommensurate values—the value of an identified legal

improvement against the process values sacrificed by overruling." (citation omitted)).

¶87 But the Associate Chief Justice thinks this existing framework insufficient. He aspires to create a "law of precedent" that will "cabin judicial discretion and promote decisionmaking by the rule of law." *Supra* ¶¶ 54, 61. In his view, we have never explained how the *Eldridge* factors are defined or interact with each other. *Supra* ¶ 53. He thus seeks to "fill the gap" in our existing stare decisis doctrine, *supra* ¶ 54, by suggesting how we may provide clarification in a future case.

¶88 I take issue with his suggestions for two main reasons. First, he looks to history and concludes that precedent should be overruled if it is "demonstrably erroneous." *Supra* ¶ 71. The problem, of course, is that this proposal assumes we can all agree a precedent is demonstrably erroneous. Agreeing on demonstrable error is not easy for any court. As one scholar pointed out about the United States Supreme Court, "cases are legion in which the Justices who comprise the majority and the Justices in dissent each appear to view the contrary position as not just wrong, but *manifestly* wrong." Kozel, *supra* ¶ 84, at 419. We should not expect this court to fare any better. Ultimately, this clarification provides none.

¶89 Second, the Associate Chief Justice effectively suggests that the only type of reliance we should consider under the second *Eldridge* factor is "specific reliance": reliance based on rules of property.[91] *Supra* ¶¶ 68–69. This would strip from consideration the various types of reliance interests that have historically informed our stare decisis analysis — in particular, societal reliance.

---

[91] The Associate Chief Justice qualifies his position by "leav[ing] for a future date" how societal reliance "should be accounted for in" our stare decisis analysis. *Supra* ¶ 73. Yet he simultaneously claims that "[m]ost any precedent can be said to shape our 'doctrine' or 'perceptions' of our 'society' to some degree[,] [a]nd that leaves nearly unlimited discretion to decide whether or not" to keep or discard precedent. *Supra* ¶ 69, n.80. He also cites concerns with societal reliance, *supra* ¶ 69, and legal scholarship dismissive of its role in the stare decisis inquiry. *Supra* ¶ 69, n.78. These statements leave little room for consideration of any reliance interests other than "specific reliance" interests.

HIMONAS, J., concurring

¶90 Societal reliance lies at the heart of stare decisis and originated with Justice Brandeis's statement that "in most matters it is more important that the applicable rule of law be settled than that it be settled right." *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406 (1932) (Brandeis, J., dissenting); *see* Emery G. Lee III, *Overruling Rhetoric: The Court's New Approach to Stare Decisis in Constitutional Cases*, 33 U. TOL. L. REV. 581, 617 (2002) ("This 'better-settled-than-right' argument clearly rests on an understanding of reliance."). It provides predictability and stability, and avoids "injustice or hardship" caused when rights are "swept away by judicial fiat." *Eldridge*, 2015 UT 21, ¶ 35 (citation omitted).

¶91 When we address reliance, we routinely consider the effect of overruling precedent on various stakeholders and the public at large. *See, e.g., Rutherford*, 2019 UT 27, ¶ 68 (analyzing reliance on our precedents by different groups of individuals and at different levels); *Rueda v. Utah Lab. Comm'n*, 2017 UT 58, ¶ 66, 423 P.3d 1175 (Opinion by Himonas, J.) (explaining that "we consider whether overturning the [precedent] now would create injustice or hardship *in the realm* of workers' compensation" and pointing out that "people have relied" on the precedent in question (emphasis added)); *id.* ¶ 193 (Opinion by Lee, A.C.J.) (describing reliance by "litigant[s]" and "lawyer[s] in this field"). Although examining societal reliance "can be a complex and daunting concept," it "is a necessary component of any stare decisis jurisprudence that aims to be complete," Kozel, *supra* ¶ 84, at 460 (italics omitted), and it has a "rightful role . . . in stare decisis debates." *Id.* at 462 (italics omitted). Indeed, many legal commentators observe that invocation of societal reliance reasoning gives a court more "legitimacy" in its stare decisis analysis. *See, e.g.,* William S. Consovoy, *The Rehnquist Court and the End of Constitutional Stare Decisis:* Casey, Dickerson *and the Consequences of Pragmatic Adjudication*, 2002 UTAH L. REV. 53, 54–55 (2002); Tom Hardy, *Has Mighty Casey Struck Out?: Societal Reliance and the Supreme Court's Modern Stare Decisis Analysis*, 34 HASTINGS CONST. L.Q. 591, 603 (2007); Lee, *supra* ¶ 90, at 582–87.

¶92 Again, two main goals of the doctrine of stare decisis are predictability and fairness. *See Eldridge*, 2015 UT 21, ¶ 21. Perhaps the suggestion to consider only "specific reliance" would lead to more predictable outcomes for litigants lobbying this court to overturn precedent; perhaps not. But it most certainly would come at the price of decreased predictability and fairness for all other stakeholders who, knowingly or not, have come to rely on a stable body of relevant law.